***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission affirms the Opinion and Award of Deputy Commissioner Houser and enters the following Opinion and Award:
 ***********
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act. *Page 2 
2. On October 30, 2009, the date Plaintiff-Employee informed Defendant-Employer of his alleged occupational disease, an employee-employer relationship existed between Plaintiff-Employee and Defendant-Employer. As of the hearing date before the Deputy Commissioner, Plaintiff remained a full time employee of Defendant-Employer.
3. All parties are correctly named in the above caption. Defendant-Employer is insured by The Phoenix Insurance Company and Travelers is the servicing agent.
4. Plaintiff's average weekly wage for the purpose of this action was $764.79, resulting in a compensation rate of $509.86.
5. At the hearing before the Deputy Commissioner, the parties submitted the following:
 a. A Packet of Various Stipulated Documents, which was admitted into the record and marked as Stipulated Exhibit (2) and which included the following:
 i. Medical Records;
 ii. Industrial Commission Forms;
 iii. Discovery Responses;
 iv. An Ergonomic Job Analysis and DVD;
 v. A Manual Lifting Policy and;
 vi. A Transcript of Plaintiff's Recorded Statement.
 b. A DVD, purporting to depict Plaintiff's job duties, which was admitted into the record and marked as Stipulated Exhibit (3).
6. Also made part of the record are the depositions of Dr. William Mallon and Mr. Alex Arab. *Page 3 
 ***********
As set forth in the Pre-Trial Agreement and Deputy Commissioner Houser's February 3, 2011 Opinion and Award, the Full Commission addresses the following:
 ISSUES
1. Whether Plaintiff's employment with Defendant-Employer caused or significantly contributed to the development of a compensable occupational disease?
2. Whether Plaintiff's employment with Defendant-Employer exposed him to an increased risk of developing a compensable occupational disease as opposed to members of the general public not so employed?
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. As of the hearing date before the Deputy Commissioner, Plaintiff was forty-nine (49) years of age with his date of birth being June 2, 1961. Plaintiff has obtained a GED and has taken approximately three years of classes at a technical school. Plaintiff's employment history consists of working for various employers, primarily as a machinist.
2. Plaintiff began his employment with Defendant-Employer in October 2003. Plaintiff testified that prior to that time he never experienced any medical problems with his arms.
3. Defendant-Employer produces industrial valves of various sizes. Some valves are small enough that a worker can hold it in the palm of their hand. Other valves weigh as much as thirty-three thousand (33,000) pounds.
4. Plaintiff worked for Defendant-Employer as a valve assembler in its forged steel *Page 4 
assembly department. Valve assemblers are assigned to different work areas, referred to as cells. Plaintiff assembled various sized valves, some weighing only a few pounds and others as much as one hundred and twenty-five (125) pounds. In general, the valve assembler job requires a worker to obtain parts from a bin, load the parts onto a cart, push the cart to a work station, then place the parts on a vice, and assemble the valve using wrenches and other tools. Generally, when a valve was completely assembled, it would be mechanically lifted from the vice and returned to the cart.
5. Plaintiff testified that he performed his job somewhat differently than how the valve assembler job is depicted in the DVD produced by Defendants. Specifically, Plaintiff testified that he did not use any mechanical means to lift completed valves, regardless of their size. Plaintiff further testified that he was never instructed or ordered to use a mechanical device to lift objects of any certain weight.
6. Plaintiff would assemble thirty to one hundred (30-100) valves in an average shift. Plaintiff further testified that he would torque his wrench between forty-seven and fifty-one (47-51) times per valve for most valves. According to Plaintiff, approximately one-half of the valves he assembled weighed fifty (50) pounds, the others weighing more than fifty (50) pounds.
7. Contrary to Plaintiff's testimony, Mr. Clarence "CD" Whitehurst, Plaintiff's supervisor, testified that the cell in which Plaintiff worked generally handled valves weighing fifty (50) pounds or less. Mr. Whitehurst, who has performed Plaintiff's job, further testified that ninety percent (90%) of the lifting required in Plaintiff's work cell was of fifty (50) pounds or less. According to Mr. Whitehurst, Defendant-Employer has a separate work cell for valves weighing more than fifty (50) pounds and Plaintiff did not work in that cell.
8. Mr. Whitehurst testified that Plaintiff's overall description of the duties he *Page 5 
performs was not an accurate portrayal of the job. Mr. Whitehurst testified that removing the parts from the work cart would be the only activity that really required a bicep curling motion. Mr. Whitehurst further testified that the valve assembler job is less repetitive than as described by Plaintiff. According to Mr. Whitehurst, the job involves the use of twenty to forty (20-40) different parts that further require the use of different sized wrenches, so a valve assembler is constantly changing tasks.
9. Mr. Nathan Poissant, Defendant-Employer's Safety and Health Environmental Affairs Manager, testified that he agreed with Mr. Whitehurst's testimony regarding Plaintiff's job duties and deferred to Mr. Whitehurst regarding the actual physical job requirements. Mr. Poissant further testified that in his opinion, the written and video job analysis fairly and accurately depicted Plaintiff's job as a valve assembler.
10. Mr. Alex Arab is a licensed physical therapist, a certified ergonomist, and functional capacity evaluator. Mr. Arab is the manager of Injury Management Services, Inc. and specializes in performing functional capacity evaluations and ergonomic job analyses. Mr. Arab was retained by Defendants to perform an ergonomic job analysis of Plaintiff's job as a valve assembler.
11. As part of his assessment, Mr. Arab met with and interviewed Mr. Poissant and Mr. Whitehurst at the facility where Plaintiff worked. Mr. Arab was provided information about Plaintiff's length of employment, his work cell, the tools he used, the working conditions, and other relevant information. At the facility, Mr. Arab went to the cell where Plaintiff worked and observed someone performing Plaintiff's job. Mr. Arab used scales and other devices to obtain accurate weight measurements of the parts and tools used in Plaintiff's cell. Additionally, Mr. Arab videotaped an employee performing the job. *Page 6 
12. Based upon his assessment, Mr. Arab testified that approximately ninety-five percent (95%) of the parts and equipment used in Plaintiff's work cell weighed fifty (50) pounds or less. Mr. Arab further testified it was rare for employees working in Plaintiff's cell to handle material weighing more than fifty (50) pounds. Additionally, Mr. Arab testified that there was not an extensive amount of bicep curling involved in the performance of the job and that there were multiple non-repetitive body part movements. Mr. Arab also opined that that Plaintiff's description of the job was inconsistent with his observations and analysis of the actual physical job requirements.
13. Plaintiff testified that he first experienced pain symptoms in August 2009, with the pain being in his lower biceps and upper forearm of both arms.
14. On October 29, 2009, Plaintiff sought treatment from his primary care physician, Dr. Laura Bowen, and reported experiencing bilateral biceps and upper forearm pain. Plaintiff told Dr. Bowen about his job as a valve assembler, and his use of wrenches, hammers, and vices. Plaintiff further informed Dr. Bowen that his symptoms improved over the weekends when he was not working. Due to the nature of Plaintiff's symptoms, Dr. Bowen referred him to Dr. William Mallon at Triangle Orthopaedics.
15. Dr. Mallon first examined Plaintiff on October 30, 2009, at which time Plaintiff reported having experienced pain for approximately two-months in both of his biceps tendons at his elbows. Plaintiff also reported the nature of his job and the repeated motions it required. Dr. Mallon diagnosed Plaintiff as having bilateral biceps tendonitis, which is the same as bicipital tenosynovitis.
16. Dr. Mallon testified that he sees this type of injury in two types of people. First, with patients who are lifting throughout the day, and second in patients who extensively lift *Page 7 
recreational weights, such as at a gym.
17. On October 30, 2009, Dr. Mallon assigned Plaintiff work restrictions of no lifting, pushing or pulling more than twenty (20) pounds with either arm. On December 8, 2009, Dr. Mallon reduced Plaintiff's lifting, pushing or pulling limit to no more than five (5) pounds.
18. Through the hearing date before the Deputy Commissioner, Defendant-Employer has had suitable employment available for Plaintiff within his physical restrictions and Plaintiff has continued to work and earn his normal wages.
19. On February 4, 2010, Plaintiff underwent an MRI of his right elbow, the results of which revealed that he had tendinosis and a high grade partial tear. According to Dr. Mallon, this means that Plaintiff's right biceps tendon was eighty to ninety percent (80%-90%) torn from the bone.
20. On April 8, 2010, Dr. Mallon recommended surgery for Plaintiff's condition and opined that this sugery has a high probability of success. As of the hearing date before the Deputy Commissioner, Plaintiff had not undergone the surgery recommended by Dr. Mallon because he could not afford to be out of work or to pay the insurance co-pays and deductibles.
21. Defendants have made an issue regarding Plaintiff having allegedly lifted weights recreationally near the time he began to experience symptoms. However, although such lifting could have caused the condition diagnosed by Dr. Mallon, the Full Commission finds this issue to be of little relevance in determining whether Plaintiff developed this condition as the result of his employment with Defendant-Employer. Just as speculative causation evidence is insufficient to prove a particular condition is compensable, likewise insufficient is speculative causation evidence of an alternate cause of that condition. This differs from evidence that a non-work related activity more likely than not resulted in a condition for which a claimant seeks compensation. *Page 8 
(Emphasis Added.)
22. Dr. Mallon has opined that Plaintiff's employment with Defendant-Employer caused or significantly contributed to the development of his bilateral bicipital tenosynovitis. Dr. Mallon further opined that Plaintiff's employment with Defendant-Employer exposed him to an increased risk of developing bilateral bicipital tenosynovitis as opposed to members of the public not so employed. Dr. Mallon's opinions are based upon Plaintiff's report of symptoms and his duties as a valve assembler.
23. Mr. Arab has opined Plaintiff's employment with Defendant-Employer did not expose him to an increased risk for developing a cumulative trauma injury as compared to members of the general public not so employed. Additionally, Mr. Arab has opined that based upon his ergonomic analysis, the risk for cumulative trauma was low for both arms. Mr. Arab also testified that he was not aware of any documented recognizable link between the valve assembler job and a bicep tendon injury.
24. Mr. Arab advertises that his ultimate goal is case closure, and has never performed an ergonomic job analysis for an attorney representing a claimant.
25. Plaintiff's work load, and the size of the valves he assembled, varied day to day. Additionally, although there is conflicting evidence regarding the weights with which Plaintiff worked, the Full Commission finds that Plaintiff's duties throughout almost an entire shift required him to grasp objects with his hands on a continual basis.
26. Based upon the totality of the credible evidence of record, the Full Commission gives greater weight to the testimony and opinions of Dr. Mallon, as Plaintiff's treating physician and a board-certified orthopedic surgeon, than to those of Mr. Arab.
27. Based upon the totality of the credible evidence of record, the Full Commission *Page 9 
finds that Plaintiff's employment with Defendant-Employer caused or significantly contributed to the development of his bilateral bicipital tenosynovitis. Additionally, Plaintiff's employment with Defendant-Employer exposed him to an increased risk of developing this condition as opposed to members of the general public not so employed.
28. The Full Commission finds that Dr. Mallon is the most appropriate physician to continue care for Plaintiff's compensable bilateral bicipital tenosynovitis.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In workers' compensation cases, a claimant has the burden of proving every element of compensability. Whitfield v. Lab Corp. ofAmer., 158 N.C. App. 341, 581 S.E.2d 778, (2003); Harvey v.Raleigh Police Department,96 N.C. App. 28, 384 S.E.2d 549, disc. rev. denied,325 N.C. 706, 388 S.E.2d 454 (1989).
2. North Carolina law requires that where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury. Click v. Pilot FreightCarriers, Inc., 300 N.C. 164, 265 S.E.2d 389 (1980). Additionally, "the entirety of causation evidence" must "meet the reasonable degree of medical certainty standard necessary to establish a causal link." Holley v. ACTS, Inc.,357 N.C. 228, 581 S.E.2d 750 (2003); Young v. HickoryBus. Furn., 353 N.C. 227, 538 S.E.2d 912 (2000). "[A]lthough medical certainty is not required, an expert's `speculation' is insufficient to establish causation." Id. *Page 10 
3. In order to prove that an claimant has contracted a compensable occupational disease, they must establish both causation and increased risk. Rutledge v. Tultex Corp.,308 N.C. 85, 301 S.E.2d 359 (1983). Increased risk is proved by showing: (1) that the disease is "characteristic of" and "peculiar to" individuals engaged in the claimant's particular trade or occupation; and (2) that their disease is not one to which the general public is equally exposed. Booker v. Duke Med. Ctr.,297 N.C. 458, 256 S.E.2d 189 (1979). "A disease is `characteristic' of a profession when there is a `recognizable link' between the nature of the job and an increased risk of contracting the disease in question." Id. at 472. A disease is "peculiar to the occupation" when the conditions of the employment result in a hazard which distinguishes it in character from employment generally.Id. at 473.
4. Based upon the totality of the credible evidence of record, the Full Commission concludes that Plaintiff's employment with Defendant-Employer caused or significantly contributed to the development of his bilateral bicipital tenosynovitis. N.C. Gen. Stat. § 97-53(13); Holley v. ACTS,Inc., 357 N.C. 228, 581 S.E.2d 750 (2003); Young v. HickoryBus. Furn., 353 N.C. 227, 538 S.E.2d 912 (2000); Rutledge v.Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983); Click v.Pilot Freight Carriers, Inc.,300 N.C. 164, 265 S.E. 2d 389 (1980); Booker v. DukeMed. Ctr., 297 N.C. 458, 256 S.E.2d 189 (1979). Additionally, Plaintiff's employment with Defendant-Employer exposed him to an increased risk of developing this condition as opposed to members of the general public not so employed. Id.
5. As the result of his compensable occupational disease of bilateral bicipital tenosynovitis, Plaintiff is entitled to have Defendants pay for all related medical expenses incurred or to be incurred, subject to the provisions of N.C. Gen. Stat. § 97-25.1, including expenses associated with the surgery recommended by Dr. Mallon, when the medical bills have been *Page 11 
approved according to established Industrial Commission procedures. N.C. Gen. Stat. §§ 97-25; 97-25.1.
6. Dr. Mallon is authorized as Plaintiff's treating physician in all matters related to his compensable disease. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following:
 AWARD
1. Defendants shall pay for all related medical expenses incurred or to be incurred by Plaintiff as the result of his compensable occupational disease of bilateral bicipital tenosynovitis, subject to the provisions of N.C. Gen. Stat. § 97-25.1, including expenses associated with the surgery recommended by Dr. Mallon, when the medical bills have been approved according to established Industrial Commission procedures.
2. Dr. Mallon is authorized as plaintiff's treating physician in all matters related to his compensable disease.
3. Defendants shall pay the costs.
This the 23rd day of August, 2011.
 S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING: *Page 12 
 S/_____________ STACI T. MEYER COMMISSIONER
 S/_____________ CHRISTOPHER SCOTT COMMISSIONER *Page 1